IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>　　　Plaintiff, | Criminal No. 4:19-CR-00172 |
| vs. | DEFENDANT MONTOYA'S<br>MOTION TO WITHDRAW<br>HER GUILTY PLEA |
| RUBY MONTOYA,<br>　　　Defendant. | FILED UNDER SEAL |

## MOTION TO WITHDRAW PLEA OF GUILTY

Defendant Ruby Montoya files this motion to withdraw her plea of guilty, pursuant to Federal Rule of Criminal Procedure Rule 11(d)(2)B), after the entry of her plea of guilty but before the Court imposes sentence.

A defendant may withdraw a plea of guilty after the court accepts the plea, but before it imposes sentence if "the defendant can show a fair and just reason for requesting the withdrawal." FRCRP 11(d)(2)(B). The 8th Circuit holds that the standard for determining if a reason is fair and just is a liberal one, *U.S. v. Murphy*, 572 F.3d 563, 568 (2009), while recognizing that '[t]he plea of guilty is a solemn act not to be disregarded because of belated misgivings about the wisdom of the same.' *Murphy* at 568 citing *United States v. Thompson,* 906 F.2d 1292, 1298 (8th Cir.1990) (quoting *United States v. Woosley,* 440 F.2d 1280, 1281 (8th Cir.1971)).

### Ms. Montoya can show a fair and just reason for her request

Ms. Montoya's plea of guilty was not voluntary. Ms. Montoya was coerced by attorney Lauren Regan to accept a packaged plea deal in "solidarity" with her

1

"comrade" in the "movement", co-defendant Jessica Rae Reznicek. *Exhibit A*. Attorney Regan stated that Ms. Reznicek would be harmed if Ms. Montoya did not accept the agreement, because the plea agreement would be withdrawn and pleading guilty was in Ms. Reznicek's best interests to avoid possible life in prison. [1] *Exhibit A, Statement of Ms. Montoya*.

**The following facts contributed to the coercion in Ms. Montoya's case**

1. A packaged plea deal was offered simultaneously to Ms. Montoya and Ms. Reznicek that required them both to plead guilty in order to receive the benefits of the plea agreement.

A plea is involuntary and therefore invalid if it is obtained "by actual or threatened physical harm or by coercion overbearing the will of the defendant." *Brady v. United States*, 397 U.S. 742, 750, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747 (1970). The Supreme Court has also explained that "a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person other than the accused might pose a greater danger of inducing a false guilty plea by skewing the risks a defendant must

---

[1] CJA counsel Angela Campbell was unaware of and did not participate in the conversation in which Attorney Regan pressured Ms. Montoya to plead guilty in solidarity with Ms. Reznecik. However, Attorney Campbell did recommend that Ms. Montoya accept the packaged plea agreement even though Ms. Montoya objected to be considered the same in culpability as Ms. Reznecik and continued to profess her innocence. *Exhibit A*. Ms. Montoya recognized the unfairness of requiring her to accept the agreement even though her circumstances were different and even though she wanted to pursue trial, but Ms. Montoya did not know the correct legal words.

Also of importance, prior to the entry of her plea of guilty, Ms. Montoya understood that Attorney Lauren Regan was her lead attorney and that Attorney Campbell had been appointed to assist her lead attorney as local counsel. As a result, legal strategy and consultations were mostly between Ms. Montoya and Ms. Regan. After Ms. Montoya entered her plea of guilty, Ms. Campbell became lead and only counsel from everyone's perspective.

consider." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n. 8, 98 S.Ct. 663, 669 n. 8, 54 L.Ed.2d 604 (1978)(dictum).

In Ms. Montoya's case, the defendants were offered the same agreement, but it affected each defendant differently. For example, Ms. Reznicek has a state court felony conviction and therefore has a higher criminal history score. In addition, Ms. Reznicek has ten years of criminal history of similar acts which can be considered against her in the criminal proceedings in multiple ways including but not limited to: (1) in trial for proving identity, intent or any other admissible basis under FRE 404(b) (2) in trial for proving predisposition to commit these type criminal acts in response to a defense of entrapment and (3) in sentencing to impose the terrorism enhancement, to increase her criminal history category and to justify a sentence at the higher end of the guideline range in order to accomplish the goals of sentencing, that is, to prevent future criminal acts and to provide fair and proportionate sentencing. Ms. Montoya's past does not include prior similar acts and therefore her risk at trial is different than Ms. Reznicek and at sentencing with regards to application of the terrorism enhancement, her guideline range and her appropriate sentence within the guideline range are different than Ms. Reznicek.

Courts have found that the packaged plea deals even when they do not involve disparate treatment have the same risk as separate plea agreements with different impacts on different parties because "every defendant may not be equally interested in bargain shopping. Familial or fraternal coercion of putative confederates in package

3

plea deals is a serious concern." *U.S. v. Hodge*, 412 F.3d 479, 489 (3rd Cir. 2005). "Quite possibly, one defendant will be happier with the package deal than his codefendant(s); looking out for his own best interests, the lucky one may try to force his codefendants into going along with the deal." *U.S. v. Martinez-Molina*, et al, 64 F. 3d 719, 733 (1st Cir. 1995), citing *United States v. Caro*, 997 F.2d 657, 659-60 (9th Cir. 1993). See also *Plunk v. Hobbs*, 766 F.3d 760 (8th Cir. 2014)(recognizing that packaged plea deals can impact the voluntariness of a plea and raising the issue of the conflict of interest such plea offers can create which is the next fact addressed in this motion.

Pressure from a confederate is exactly what happened in Ms. Montoya's case. Co-defendant Reznicek (the confederate) wanted to accept the plea agreement. She conveyed her coercion through counsel to Ms. Montoya. Attorney Regan placed intense pressure on Ms. Montoya to honor Ms. Montoya's commitment to the movement and her comrade by pleading guilty. *Exhibit A*. Ms. Montoya did not agree with this position.

2. Attorney Regan labored under a conflict of interest between her representation of movements and her representation of individual Ruby Montoya.
Attorney Stephen Montoya labored under a conflict of interest between the risk of damage to his personal reputation from exposure of his horrendous abuse of his daughter, Ms. Montoya, and representation of his daughter.

The 8th Circuit points out that prior to *Plunk* the published authorities in this area concern whether a defendant is entitled to relief when he followed advice of a conflicted attorney, either to plead guilty or to decline to plead guilty. "If a defendant

follows counsel's recommendation, foregoes an alternative line of defense, and shows that the attorney's advice was influenced by a conflict of interest, then prejudice may be presumed." *Plunk* at 766. Ms. Montoya's case is one of those. Prejudice should be presumed in Ms. Montoya's case.

Ms. Montoya was coerced by Attorney Regan who is the lawyer who Ms. Montoya consulted in making the decision to enter her plea of guilty. The packaged plea deal collided with Attorney Regan's conflict of interest between the organization for which she is Executive Director and the individual client. Ms. Regan's view is that activists must support the movement when resolving their criminal cases and must support their comrades.

An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance. The effect must be actual and demonstrable, causing the attorney to choose to engage or not to engage in particular conduct. To make such a showing, the defendant must identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict. *Noe v. United States*, 601 F.3d 784, 790 (8th Cir.2010)

Prejudice is presumed when a conflict of interest arising from multiple representation adversely affected counsel' representation. *Plunk v. Hobbs*, 766 F.3d 760, 764 (2014),citing *Cuyler v.Sullivan*, 446 U.S. 335, 349-50, 100 S.Ct. 1708, 64

L.Ed.2d 333 (1980). *Plunk* also points out that "A rule requiring a defendant to show specific prejudice 'would not be susceptible of intelligent, evenhanded application.'" *Plunk* at 764 citing *Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). "When a defendant shows that counsel refrained from pursuing a particular strategy or tactic on his behalf because of loyalty to another extant client, there is no effective way to determine what would have happened if counsel had performed without a conflict of interest. Especially in the context of plea negotiations, 'to assess the impact of a conflict of interest on the attorney's option, tactic and decisions in plea negotiations would be virtually impossible' and an inquiry into harmlessness of the error would require 'unguided speculation.'" *Id*, citing *Holloway* at 91. However, to trigger the presumption of prejudice after trial, the defendant would need to show a plausible alternate strategy that was not pursued, show that the alternative strategy was objectively reasonable under the facts of the case and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict. *Plunk* at 764, citing *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004). Ms. Montoya objected to conflicted counsel prior to sentencing (rather than after sentencing) and as soon as possible after she learned of the conflict and could investigate the alternative strategies.

Attorney Regan's conflict of interest is displayed by the website for the Civil Liberties Defense Center (CLDC). *Exhibit F.* Attorney Regan is Executive Director of the CLDC. The mission of the CLDC is to "support(s) movements that seek to

dismantle the political and economic structures at the root of the societal inequality and environmental destruction. We provide litigation, education, legal and strategic resources to strengthen and embolden their success." The website includes for purchase a "solidarity" t-shirt which depicts an incarcerated bear (martyr) being lifted up by his/her comrades.

    In this case, Ms. Regan's conflict of interest caused her to choose the strategy of entering a plea of guilty rather than the strategy of trial. Attorney Regan advised Ms. Montoya that she must plead guilty in "solidarity" with her comrade in the movement. In this case, counsel's conflict of interest caused her to choose not to investigate defenses raised by the evidence. Both of Ms. Montoya's lawyers, Attorney Regan and Attorney Campbell failed to pursue plausible alternatives. Specifically, Attorney Regan failed to investigate defenses related to Ms. Montoya's mental condition, failed to investigate Ms. Montoya's lack of the requisite mens rea, failed to investigate possible entrapment by government agents, and failed to investigate the cost of repair which establishes a statutory jurisdictional limit as well as other jurisdictional limitation. *Exhibit G email from Ms. Montoya asking Attorney Regan to interview Dr. Tucker Brown, Exhibit A, Statement of Ms. Montoya* and *Exhibit U, Additional Statement of Gabriel Montoya.*

    With regards to the defenses related to Ms. Montoya's mental condition, a defense that Ms. Montoya was more susceptible to coercion and that she was coerced into believing that she was not committing a serious crime by people within the

movement conflicts with counsel's representation of the organizations in the movement. The defenses related to mental capacity which Ms. Montoya sought to investigate would impugn the integrity of the movement and those leaders who coerced Ms. Montoya to act.

Ms. Montoya's father, Stephen Montoya, who was participating on the legal team also operated under a conflict of interest. Stephen Montoya is a civil rights lawyer, and is the cause of Ms. Montoya's mental health condition having severely abused Ms. Montoya and all other family members physically and mentally. *Exhibit A*. Mr. Montoya had a different kind of conflict of interest. He had an interest in ensuring that Ms. Montoya pled guilty instead of investigating her mental condition, because this investigation would necessarily publicly highlight his personal criminal conduct. Mr. Montoya likewise counseled Ms. Montoya to plead guilty.

As discussed below, evidence supports plausible defenses of diminished capacity to form the specific intent, lack of mens rea, entrapment by government agents and failure to satisfy the statutory mandatory cost minimum and other jurisdictional issues.

The representation of both Attorney Regan and Attorney Montoya was actually affected by their conflicts of interest. "Once a defendant shows that a conflict of interest actually affected the adequacy of his representation, he is automatically entitled to relief; there is no need to establish that the Sixth Amendment violation might have adversely affected the outcome of the case." *Plunk v. Hobbs*, 719 F.3d 977,

985 (8th Cir. 2013), citing Wayne R. LaFave, Crim.Proc. §11.9(d)(overturned en banc on other grounds)

3. Ms. Montoya suffered from diminished mental capacity that affected her ability to evaluate the plea agreement and make a knowing decision to accept the agreement.

It is important to set the record straight at the start of this discussion that Ms. Montoya was subjected to horrifying abuse and neglect for her entire childhood, locked insider her home with no one to protect her. *Exhibits A, H-Q, T, and U*. Ms. Montoya did not have a "troubled" childhood which suggests that she was trouble and her father overacting to control the trouble. Ms. Montoya was a victim of physical and emotional abuse almost every day of her life through no fault of her own. Ms. Montoya was an angel of a child. Her father was a monster. Ms. Montoya's diminished mental capacity caused her to be more susceptible to the coercion that led to her conduct and that led to her agreement to plead guilty. The strength of Ms. Montoya's will to overcome the coercion was impacted by her mental condition. "When in these dissociative and hyperaroused states, Ms. Montoya's dependence on others is amplified and she operating at a reduced mental capacity and unable to make decisions for herself. It appears unlikely that she could have refused to engage in the charged conduct given these dynamics. It is my opinon that Ms. Montoya was operating at a diminished capacity at the time of her charged conduct as a direct result of her PTSD and Dependent Personality disorder." *Exhibit P*. Ms. Montoya's mental

condition has made it difficult for her to absorb the trauma to the climate by industry and it has caused her to have a high level of compassion for others such that she was unable to care for herself, only her co-defendant. After her brother Gabriel Montoya escaped the torture of the household, Ms. Montoya became the protector of all family members impacted by the torture of her father including her younger siblings and her mother who continues to be unable to recover from the abuse. *Exhibit A*. The natural trauma response to protect made it impossible for Ms. Montoya to choose her own interests over those of her codefendant, Ms. Reznicek.

With regards to Ms. Montoya's mental condition, both Attorney Regan and Attorney Campbell were ineffective for failing to investigate her condition. In *Plunk*, the defendant also raised the issue of the conflict of interest causing his lawyer not to investigate his mental condition. The 8th Circuit notes that the district court found that the lawyer's "failure to investigate Plunk's impairments beyond obtaining one psychiatric evaluation fell below the *Strickland* objective standard of reasonableness, but concluded that Plunk failed to show prejudice." *Plunk* at 767-768. In Ms. Montoya's case, the lawyers failed to secure **any** psychological examination, and Ms. Montoya provides evidence from medical providers that reveal actual prejudice.

***If the district court determines the defendant has presented a fair and just reason to withdraw her plea, the court may consider several other factors***

The factors include "whether the defendant asserts his legal innocence of the charge, the length of time between the plea and the motion to withdraw, and whether the government will be prejudiced by the withdrawal." *Murphy* at 568. Citing *United States v. Gray*, 152 F.3d 816, 819 (8th Cir. 1998).

**Ms. Montoya asserts that she is actually innocent and presents plausible defenses that should have been investigated.**

**Mens Rea and Diminished Mental Capacity**

Ms. Montoya did not have the requisite mens rea to commit the crimes alleged. Ms. Montoya has clarity of vision and understanding of the science that led to the environmental damage and politics that failed to stop the degradation. Ms. Montoya also has diminished mental capacity that permitted coercion by a multitude of forces that caused her not to recognize the criminality of the conduct subject of this case, that is, not to intend the specific criminal conduct. The statutes charged require that she act knowingly or maliciously depending upon the statute. Ms. Montoya did not act knowingly or maliciously on any occasion.[2]

---

[2] As noted above, Ms. Montoya's lawyers were ineffective in failing to investigate mental condition. Defendant does not have to prove the defenses; however, defendant offers proof that her mental condition could provide a defense to some or all of the charges lodged against her. In addition, she may have been entrapped and the statutory minimum and other statutory requirements may not have been met.

11

The multitude of forces include:

1. Ms. Montoya's mind was overwhelmed by the climate crisis and the necessity to overcome the crisis,
2. Ms. Montoya had been traumatized by her father in formative years such that he controlled every aspect of her actions and thoughts and encouraged conduct that is recognized as criminal without giving her a boundary of what's criminal. He normalized violence and destruction but exuding it on her.
3. With this background of trauma, Ms. Montoya was then coerced by the activist community within the Catholic Worker Des Moines. This activist community offered the opportunity to engage in destruction but did not give Ms. Montoya the information and other tools she needed to evaluate what they requested. They assumed she knew and understood her actions for the same reason the Court and lawyers are now confused. Ms. Montoya is exceptionally bright. She presents with calm composure. Bright and a facade of composure do not overcome trauma. The catholic activist communities have developed guidelines to follow when engaging in activism which includes prayerful evaluation of all possible actions in order to discern the appropriate action. These guidelines were not followed in Ms. Montoya's case. As a result, Ms. Montoya was misled, not properly informed and never had the opportunity to prayerfully discern her actions.

### **Ms. Montoya may have been entrapped by government operatives**

A government operative either undercover law enforcement or civilian on contract with law enforcement may have encouraged Ms. Montoya and Ms. Reznicek to use a welding torch to make holes in empty pipes and may have trained them on how to use the torch.

Ms. Montoya's lawyers were ineffective in failing to investigate government entrapment. When asked, by Attorney Campbell, the government agreed it was possible that a government agent may have encouraged and taught them how to use a

welder and therefore Attorney Campbell had direct knowledge of the need to investigate the issue.

Attorney Regan was no longer counsel at the time that this specific information was received but Attorney Regan is well aware of the government's involvement in protests. Attorney Regan is specifically aware that the government will place operatives into protests to incite criminal conduct that might end the protests with arrests and subject protestors to criminal liability beyond their expectations which may dampen the efforts of other protests. Specifically, Attorney Regan knows this fact because she traveled to Texas to defend tree sitters in East Texas who had used a device called a sleeping dragon to lash themselves to equipment. The protestors learned how to make this device from and were encouraged to use it by Austin police officers working under cover. The government charged the protestors with manufacturing a criminal instrument which is a felony in Texas and therefore carries greater ramifications than the misdemeanor trespass charge with which the protestors expected to be charged. It is during Ms. Regan's representation of tree sitters that Ms. Silverman learned of the policies supported by Ms. Regan –solidarity in plea bargaining, no cooperation with the government ever, and one lawyer for all to the extent possible in order to ensure the other two policies.[3]

---

[3] Ms. Silverman confronted Ms. Regan about these policies at the time and has continuously opposed them since that time. The victims of these policies in East Texas ended up with felony convictions that impacted their lives. Ms. Montoya is the worst nightmare of these policies come true.

### *Counts 2, 4, 6, and 8 of the Indictment fail to allege offenses.*

Counts 2, 4, 6 and 8 allege that Ms. Rezneicke and Ms. Montoya knowingly used fire, namely and ocy-acetylene cutting torch, to conspire to damage, damage and attempt to damage an energy facility in violation of 18 U.S.C. 1366(a). Breaking down the statute, 18 U.S.C. 1366(a) permits prosecution for the following offenses:

1. Knowingly and willfully damage or attempt or conspire to damage the property of an energy facility in an amount that in fact exceeds or would if the attempted offense had been completed, or if the object of the conspiracy had been achieved, have exceeded $100,000. Ms. Montoya's indictment fails to properly allege part of the intent that is it fails to allege that the conduct was willful, and the indictment fails to allege that the conduct damaged the facility in an amount in excess of $100,000. The estimated actual cost to repair one hole is $12,000. *Exhibit R.* There were 4 holes charged in the substantive counts of the indictment that underlie the conspiracy count; therefore, an estimate to repair all 4 holes is $48,000 which is less than half the substantive jurisdictional requirement for her charge. Additional information is needed in order to provide an exact estimate. *Exhibit R.* Ms. Montoya's lawyers advised her to plead guilty to the charge without having one shred of evidence about the cost of repair. The government did not provide any cost information until shortly before sentencing and the only information provided was a chart, none of the underlying data needed to perform an estimation of the cost.

2. Knowingly and willfully damage or attempt or conspire to damage the property of an energy facility in any amount AND causes or attempts or conspires to cause a significant interruption or impairment of a function of an energy facility. Ms. Montoya's indictment fails to allege an interruption or impairment because the fact is that none of the pipes were in operation to have the operation interrupted or impaired.

Ms. Montoya is actually innocent of the conspiracy and counts 2,4,6 and 8 because the cost of the repair for count charged is under the statutory minimum of $100,000. *Exhibit R.* Even if counts 2, 4, 6, and 8 had been charged properly, Ms. Montoya is actually innocent of counts 2, 4, 6, and 8 because the cost of the repair for each is under $100,000 and there is interruption or impairment of operation because the pipe was in operation.

**Ms. Montoya is actually innocent of counts 3, 5, 7, and 9 because none of the pipes were actively in use in interstate commerce.**

Counts 3, 5, 7, and 9 allege that Ms. Reznicek and Ms. Montoya maliciously damaged and destroyed by means of fire, personal property used in interstate commerce. None of the pipes were in operation at the time that holes were made; therefore none of the pipes were **actively** in use in interstate commerce. *Exhibit A.* The Supreme Court has determined in an 8th circuit case that Congress did not intend to use its full commerce power when it enacted 18 U.S.C. 844(i). *U.S. v. Rea*, 300 3d 952, 960 (8th Cir 2002), citing *Jones v. United States*, 529 U.S. 848, 854-855, 120 S.Ct.

1904 (2000). Instead, the Supreme Court found "that the qualifying words 'used in' require that the damaged property must have been **actively** employed in interstate commerce or in an activity affecting interstate commerce." *Id.* The pipelines in Ms. Montoya's case were not actively involved in interstate commerce. In fact, the pipes were not in operation at all, and it's permitting was still under scrutiny. *Exhibit A.* Ms. Reznicek and Ms. Montoya are actually innocent of counts 3, 5, 7, and 9.

In addition, Ms. Montoya did not have malicious intent. On the contrary, Ms. Montoya's intent was to save the Earth from the devastating destruction of the oil industry upon the natural resources owned by all citizens or by none with no citizen having the right to engage in destruction to the detriment of others. *Exhibit A.* The Court should not even get to this issue considering the case precedent requiring the property to be actively used in interstate commerce, but Ms. Montoya is actually innocent on this ground as well.

### The plea agreement in this case is an illusory plea bargain

As a result of the fact that the defendants could not be found guilty of any of the substantive counts of their indictment, the defendants gained nothing from the plea agreement. A plea bargain that is induced by dismissal of substantive counts for which the defendant cannot be found guilty provides no bargain to the defendants and is an illusory plea bargain.

### *Ms. Montoya sought counsel to withdraw her plea in April*

Ms. Montoya sought counsel to evaluate withdrawal of her plea in April, only about three months after the entry of her guilty plea. This lawyer was unable to assist her. Ms. Montoya did not delay in her endeavor to seek justice.

The present delay from the time of hiring Ms. Silverman to assist Ms. Campbell is attributable to the agreement of all parties to complete the investigation of Ms. Montoya's mental health prior to taking any further action on the case.

In addition, prior to entering her plea of guilty, Ms. Montoya sought to have her lawyers investigate various defenses specifically including her mental health condition. *Exhibit A*. None of those defenses were investigated. Ms. Montoya raised the issue of her mental condition on multiple occasions prior to entering her plea of guilty. On each occasion, her lawyers failed and refused to investigate the defense. In an email on May 18 2020, Ms. Montoya informed counsel Lauren Regan that her counselor Tucker Brown was willing to provide a report about his work with Ruby. *Exhibit A*.

### **Government was not prejudiced by the plea**.

Government was not prejudiced by the plea and will not be prejudiced by withdrawal of the plea.

## *Conclusion*

The practice of law is the search for the truth. No search for truth occurred in Ms. Montoya's case. The failures are not Ms. Montoya's failures. The failures fall upon the defense attorneys who failed to investigate defenses and supported a packaged plea deal that coerced Ms. Montoya's plea of guilty. The failures fall upon the prosecution who offered a packaged plea deal tethered to a defendant who was differently situated and who was not assisting them in seeking the truth. It is time to begin that search for the truth. Ms. Montoya has presented fair and just reason to permit her to withdraw her plea.

Respectfully Submitted,

Daphne Pattison Silverman

/s/ Daphne Pattison Silverman
Daphne Pattison (Silverman)
501 N IH 35
Austin, Texas, 78702
512-975-5880
daphnesilverman@gmail.com

## **CERTIFICATE OF CONFERENCE**

Daphne Pattison Silverman certifies that she has conferred with counsel for the government and he is opposed to the motion to withdraw guilty plea.

/s/ Daphne Pattison (Silverman)
Daphne Pattison (Silverman)

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing Motion to Withdraw was served upon all parties electronically through the CM/ECF system on August 26, 2021.

/s/ Daphne Pattison Silverman<br>
Daphne Pattison Silverman