IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 4:19-CR-172 |
| | ) | |
| v. | ) | GOVERNMENT'S |
| | ) | SENTENCING |
| RUBY KATHERINE MONTOYA, | ) | MEMORANDUM |
| | ) | |
| Defendant. | ) | **FILED UNDER SEAL** |

## Table of Contents

INTRODUCTION ................................................................................................................ 1

ADVISORY GUIDELINES RANGE ................................................................................. 2
   *1.* The PSR is factually accurate as written .................................................................. 2
   *2.* The offense was intended to promote a federal crime of terrorism ................... 2
   *3.* Montoya's conduct does not support a minor role reduction ............................ 8
   *4.* Montoya is not entitled to a downward departure for voluntary disclosure .... 9

THE § 3553(a) FACTORS SUPPORT A SENTENCE OF 96 MONTHS' PRISON ... 10

CONCLUSION .................................................................................................................. 16

## INTRODUCTION

Montoya and codefendant Reznicek conspired to destroy and sabotage the Dakota Access Pipeline (DAPL) in South Dakota and Iowa. As part of the agreement, Montoya and Reznicek engaged in a series of extremely dangerous actions including using accelerants to set fire to numerous construction vehicles and using an acetylene torch to burn holes in the pipeline. Their actions were calculated to both prevent the DAPL from being constructed, and influence or affect the conduct of the United States government by intimidation or coercion, and/or to retaliate against government conduct. The Court should impose a sentence of 96 months' imprisonment.

1

## ADVISORY GUIDELINES RANGE

The PSR correctly calculates the advisory guidelines range as follows:

| | |
|---|---|
| Base offense level (§2K1.4(a)(4)) | 23 |
| Terrorism Enhancement (§3A1.4(a)) | +12 |
| <u>Acceptance of responsibility (§3E1.1)</u> | <u>-3</u> |
| Total offense level | 32 |
| | |
| Criminal History | VI |
| | |
| Guidelines range: | 210-240 months' imprisonment |

*1. The PSR is factually accurate as written*

Defendant objects to inclusion of information pertaining to attacks on the DAPL prior to November 8, 2016, as set forth in PSR ¶¶ 10-13. Given the similar nature and location of these attacks on the DAPL, the information contained therein is relevant to sentencing and should be considered by the court.

*2. The offense was intended to promote a federal crime of terrorism*

Defendant objects to terrorism enhancement under USSG §3A1.4(a) (PSR ¶ 37) because her conduct was not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). This conclusion is contrary to Montoya's own statements and should be rejected by the Court.

Section 3A1.4 provides: (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32. The term "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g) as "an offense that: (A) is calculated to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct; and (B) is a violation of section ... 1366(a) (relating to destruction of an energy facility)....

"A defendant has the requisite intent if he or she acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind." *United States v. Hassan*, 742 F.3d 104, 148–49 (4th Cir. 2014). "Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object." *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014) quoting *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010).

On July 24, 2017, Defendants Montoya and Reznicek released a public statement wherein they admitted to committing numerous acts of vandalism and sabotage to the Dakota Access Pipeline (DAPL) in Iowa and South Dakota. (PSR ¶ 28). Shortly thereafter, Montoya and Reznicek publicly read their statement in front of the Iowa Utilities Board (Ex. 53, 54), the state government agency responsible for regulating[1] utilities to ensure that reasonably priced, reliable,

---

[1] Oil and gas pipelines are regulated by both federal and state agencies across the United States. Interstate pipelines are managed by the Federal Energy Regulatory Commission (FERC) and the U.S. Department of Transportation (DOT). The Federal Energy Regulatory Commission regulates pipelines, storage, natural gas transportation in interstate commerce, and liquefied natural gas facility construction. It also oversees operation of pipeline facilities at U.S. points of entry for natural gas imports and exports and analyzes environmental impacts of natural gas projects. Once natural gas pipeline projects are operating, the Department of Transportation's Pipeline and Hazardous Material Safety Administration (PHMSA), acting through the Office of Pipeline Safety (OPS), regulates, monitors, and enforces safety. The OPS collaborates with partnering agencies and departments to ensure pipeline operation safety, security, monitoring, and compliance. Although the federal government is responsible for developing, issuing and enforcing pipeline safety regulations, most

environmentally responsible, and safe utility services are available to all Iowans.[2] (PSR ¶ 28; Ex. 2).

The defendant's written statement clearly identifies the government as the target of their destructive conduct. While the statement begins by describing DAPL as an issue that affects the entire nation, Montoya and Reznicek quickly pivot to what they clearly perceive to be the larger issue, namely: "the rule of law, indigenous sovereignty, land seizures, state-sanctioned brutality, as well as corporate protections and pardons for their wrongdoings. To all those that continue to be subjected to the government's injustices, we humbly stand with you, and we ask now that you stand with us." (PSR ¶ 28).

More specifically, Montoya and Reznicek assert the complicity of the federal courts, arguing they "gave permission to lie and withhold information from the public resulting in a complete media blackout." (PSR ¶ 28). As a result, Montoya and Reznicek viewed sabotage of the DAPL "as an opportunity to encourage public discourse surrounding nonviolent direct action as well as exposing the inadequacies of the government and the corporations they protect." (PSR ¶ 28).

Montoya and Reznicek go on to describe their frustration with legal avenues of protest, including but not limited to public commentary hearings and environmental

---

inspections are conducted by state regulatory agencies, which are responsible for regulation, inspection, and enforcement of pipelines within state boundaries. The state agency regulations must be at least as stringent as the federal regulations. https://www.ncsl.org/research/energy/state-gas-pipelines-federal-and-state-responsibili.aspx
[2] https://iub.iowa.gov/about-us/mission-vision-statements.

impact statements, which led them to see the "clear deficiencies of our government to hear the people's demands." (PSR ¶ 28). As a result, Montoya and Reznicek conclude the system is broken[3] necessitating individuals to take direct action to remedy what they perceived to be the government's inadequacy. (PSR ¶ 28).

Montoya and Reznicek then proceed to describe, in detail, the way they targeted and destroyed equipment and infrastructure associated with the DAPL and the locations where they did so. According to their statement, they provided said detail in the hope that it would "inspire others to act boldly and peacefully." (PSR ¶ 28). When their calculated sabotage failed to garner sufficient media attention, they concluded "the federal government and Energy Transfer Partners colluded together to lie and withhold vital information to the public." (PSR ¶ 28).

While releasing such a statement may seem self-defeating, Montoya and Reznicek made clear their intent:

> For some reason the courts and the ruling government value corporate property and profit over our inherent human rights to clean water and land. We are speaking publicly to empower others to act boldly, with purity of heart, to dismantle the infrastructures which deny us our rights to water, land, and liberty. We as civilians have seen the repeated failures of the government and it is our duty to act with responsibility and integrity, risking our own liberty for the sovereignty of us all.

 (PSR 28, Ex. 64).

While stopping the DAPL may have been the immediate purpose of their unlawful conduct, Montoya and Reznicek's ultimate goal was to address "the broken

---

[3] [T]he courts and public officials allowed these corporations to steal permissions from landowners and brutalize the land, water, and people.

federal government and the corporations they continue to protect." A federal government which they described as "more like a Nazi fascist Germany as each day passes." (PSR ¶ 28).

Montoya argues that her conduct does not constitute a federal crime of terrorism because her participation in the offense was directed exclusively at the conduct of a private entity, Energy Transfer Partners. *United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008). In *Tankersley*, the district court concluded the government failed to establish that the arson was calculated to retaliate against government conduct. *Id.* at 1107. In so finding, the court pointed out that the communique issued after the arson stated the offenders were targeting greedy corporations without mentioning the government. *Id.*

In contrast, as set forth above, Montoya and Reznicek clearly identify the government as the target of their destructive conduct in their public statement issued on July 24, 2017. While the term "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g), courts have recognized that "a terrorist is 'any one who attempts to further his views by a system of coercive intimidation.'" *United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) *quoting* XVII Oxford English Dictionary 821 (2d ed. 1989); accord Webster's Third New International Dictionary 2361 (1981) ("an advocate or practitioner of terror as a means of coercion."). "The Oxford English Dictionary goes on to explain that the 'term now usually refers to a member of a clandestine or expatriate organization aiming to coerce an established government by acts of violence against it or its subjects.'" *Id.*

6

While it is true that the USSG §3A1.4(a) does not *automatically* apply to a defendant convicted of destruction of an energy facility in violation of 18 U.S.C. § 1366(a), the enhancement does apply where defendant's purpose was to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Stewart*, 590 F.3d 93, 137 (2d Cir. 2009). The fact that the only significant loss in this case was suffered by a private entity does not negate the fact that Montoya and Reznicek made clear the target of their criminal behavior by proclaiming, in front of a government agency, that:

> "[t]he DAPL is an issue that affects this entire nation and the people that are subject to its rule. With DAPL we have seen incredible issues regarding the rule of law, indigenous sovereignty, land seizures, state-sanctioned brutality, as well as corporate protections and pardons for their wrongdoings. To all those that continue to be subjected to the government's injustices, we humbly stand with you, and we ask now that you stand with us."

(PSR ¶ 28).

Montoya next argues that this evidence, which has been found to support application of USSG §3A1.4(a) to her codefendant, does not establish her purpose in committing this crime. While it is true that Montoya does not share her codefendant's history of protest and vandalism, it is also true that she conspired with Reznicek to commit numerous acts[4] of significant vandalism to the DAPL at numerous construction sites in Iowa and South Dakota from November of 2016 to May of 2017.

---

[4] November 8, 2016 (five pieces if heavy construction equipment destroyed by fire in Buena Vista County, Iowa) (PSR ¶ 14); March 13, 2017 (hole burned into DAPL in Mahaska County, Iowa) (PSR ¶ 15); March 17, 2017 (several holes burned into DAPL in Cherokee County, Iowa) (PSR ¶ 16); March 17, 2017 (holes burned into DAPL in Sioux County, Iowa) (PSR ¶ 17); March 17, 2017 (holes burned into DAPL in Lincoln

7

Moreover, immediately after jointly reading their statement on July 24, 2017, Montoya and Reznicek picked up crow bars and damaged the sign identifying the location of the Iowa Utilities Board, the state government agency responsible regulating utility service for Iowans. Neither the words spoken by Montoya, nor her actions in damaging the sign evidence an intent separate and apart from Reznicek. Instead like Reznicek, Montoya's actions in combination with her words clearly establish her intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Based upon the defendant's conduct and intent, USSG §3A1.4(a) applies in this case.

*3. Montoya's conduct does not support a minor role reduction*

To be entitled to a minor role adjustment, a defendant must show not only that she is a minor participant by comparison with other participants, but also "by comparison with the offense for which he or she was held accountable." *United States v. Bandstra*, 999 F.3d 1099 (8th Cir. 2021) quoting *United States v. Bush*, 352 F.3d 1177, 1182 (8th Cir. 2003). "Merely showing that the defendant was less culpable than co-conspirators is not sufficient if the defendant was deeply involved in the offense." *Id.*

---

County, South Dakota) (PSR ¶ 18); March 18, 2017 (hole burned into DAPL in Boone County, Iowa) (PSR ¶ 19); April 9, 2017 (multiple fires targeting mounted instrumentation and electrical conduits of the DAPL in Wapello County, Iowa) (PSR ¶ 22); April 27, 2017 (utilized accelerants to set fires targeting electrical junction box of the DAPL in Buena Vista County, Iowa) (PSR ¶ 24); May 1, 2017 (attempted vandalism of the DAPL in Minnehaha County, South Dakota) (PSR ¶ 25); and May 2, 2017 (hole burned into DAPL in Wapello County, Iowa) (PSR ¶ 26).

8

In this case, Montoya participated in a conspiracy to commit acts of significant vandalism over a six-month period at more than 10 locations. Moreover, Montoya jointly participated with Reznicek in a series of public events in which they celebrated their "direct action," and committed a final act of vandalism against the Iowa Utilities Board, all to inspire other individuals to commit similar crimes.

At no point in time during these engagements did Montoya ever distinguish her role from that of Reznicek. Instead, they openly discussed the joint and voluntary nature of their conduct. Even assuming she presents evidence to establish Reznicek took the lead in planning and decision making, Montoya's involvement was too significant to qualify as that of a minor participant.

*4. Montoya is not entitled to a downward departure for voluntary disclosure*

Pursuant to USSG §5K2.16 when a defendant

> voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a downward departure may be warranted. For example, a downward departure under this section might be considered where a defendant, motivated by remorse, discloses an offense that otherwise would have remained undiscovered. This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent, or where the defendant's disclosure occurs in connection with the investigation or prosecution of the defendant for related conduct.

First, Montoya did not make voluntary disclosures to the "authorities." Instead, Montoya and Reznicek spoke at coordinated meetings of like-minded individuals in Iowa and Minnesota. Moreover, Montoya was not motivated by remorse or a willingness to accept responsibility for her actions. To the contrary,

9

Montoya's hope in publicly proclaiming her actions was to inspire other individuals to take similar action against other pipelines or the government. As such, Montoya's actions are inconsistent with the stated purposes and spirit of this basis for departure.

**THE § 3553(a) FACTORS SUPPORT A SENTENCE OF 96 MONTHS' PRISON**

The appropriate sentence to be imposed by the Court should be "sufficient but not greater than necessary" to meet relevant sentencing objectives, which include:

1. the nature and circumstances of the offense and history and characteristics of the defendant;
2. the need for the sentence imposed –
    A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    B. to afford adequate deterrence to criminal conduct;
    C. to protect the public from further crimes of the defendant; and
    D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
3. the kinds of sentences available;
4. the guideline sentencing range;
5. any pertinent policy statement;
6. the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
7. the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a). For the reasons that follow, the § 3553(a) factors support a sentence of 96 months' imprisonment.

On July 24, 2017, Defendants Montoya and Reznicek released a public statement wherein they admitted to committing numerous acts of vandalism and property damage in the Iowa and South Dakota beginning on election night, November 8, of 2016. (Ex. 2). However, in the months leading up to November 8, 2016, several very similar incidents targeting DAPL construction sites had occurred.

In July of 2016, two bulldozers were destroyed by fire at a Jasper County DAPL construction site. (PSR ¶ 10; Ex. 8, 9, 10). An oil filter removed from one of the construction vehicles appeared to have been used to ignite the fire. (PSR ¶ 10). It was later discovered that three bulldozers and a backhoe/log transport were similarly set on fire at another DAPL construction site in Mahaska County that same night. (PSR ¶ 11; Ex. 11, 12, 13).

On August 1, 2016, a DAPL employee discovered an excavator had been destroyed by fire the previous weekend at a DAPL construction site in Jasper County Iowa. (PSR ¶ 12; Ex. 14, 15, 16). Finally, on October 15, 2016, four construction vehicles (three dozers and an excavator) were destroyed by fire at a Jasper County DAPL construction site. (PSR ¶ 13; Ex. 17, 18). Investigators later determined that newspapers soaked in fuel had been ignited in and around the engine compartment and cab of the construction vehicles. (PSR ¶ 13). No one has claimed responsibility for these crimes.

The first arson claimed by Montoya and Reznicek occurred at a DAPL construction site in Buena Vista County, Iowa, on November 8, 2016. (PSR ¶ 14). As with the prior incidents, several construction vehicles (two Caterpillar side booms, a Caterpillar excavator, a Caterpillar dozer, and a John Deere excavator) had been set on fire and destroyed. (PSR ¶ 14; Ex. 22, 23, 24). The cause of the fire was determined to be accelerant and motor oil poured into plastic coffee cans, lit with a match, and placed in the cab or around the equipment. (PSR ¶ 14).

In March of 2017, Montoya and Reznicek began utilizing an acetylene torch to cut holes in the DAPL. (PSR ¶ 15). On March 17, 2017, DAPL employees discovered a small hole on the north side of the east pipeline that had appeared to have been made with a blowtorch. (PSR ¶ 15; Ex. 25, 26). Fluid was leaking from the hole. (PSR ¶ 15). On the same day at a DAPL construction site in Cherokee County, an electrical worker discovered several holes had been cut in the pipeline with a cutting torch. (i.e., acetylene torch) or similar tool. (PSR ¶ 16; Ex. 27, 28, 29). The pipeline was unusable and required repair at considerable expense. (PSR ¶ 16).

On the same day at DAPL construction sites in Sioux County, Iowa, Montoya and Reznicek utilized an acetylene torch to compromise the DAPL at two separate locations. (PSR ¶ 17; Ex. 30, 31, 32, 33, 34). Finally, on the same day in Lincoln County, South Dakota, Montoya and Reznicek once again utilized an acetylene torch to damage the pipeline in two obvious locations. (PSR ¶ 18; Ex. 35, 36, 37). Responding agents in South Dakota immediately noticed a whistling or hissing sound originating from the 30-inch diameter pipeline. (PSR ¶ 18). It was determined the sound was caused by nitrogen gas escaping the pipeline from at least one of the damaged areas. (PSR ¶ 18).

On March 18, 2017, a member of the construction team observed a burned area on the north side and east end of the pipeline at the Boone County DAPL construction site. (PSR ¶ 19; Ex. 38, 40). While the DAPL was extensively burned, no penetration of the pipe appeared to have occurred. (PSR ¶ 19). In addition to said damage, a nearby shed was spray painted with the following statements "ur children need

12

water," "OIL IS DEATH," and "Mni Wiconi" (a Lakota Native American saying meaning water is life). (PSR ¶ 19; Ex. 39).

By early April of 2017, Montoya and Reznicek had depleted the supplies necessary to operate the acetylene torch. (PSR ¶ 28). As a result, they decided to return to arson to sabotage the DAPL. (PSR ¶ 28). On April 9, 2017, Montoya and Reznicek set three separate fires targeting mounted instrumentation and electrical conduits controlling the DAPL valve site near Hendrick, Iowa. (PSR ¶ 22; Ex. 41, 42, 43, 44, 45). Gasoline was utilized to set fire to several tires underneath the instrumentation and electrical structures of the DAPL, and next to a small building. (PSR ¶ 22). Later that month on April 27, 2017, Montoya and Reznicek again utilized accelerant-soaked towels to ignite tires around an electrical junction box at a DAPL construction site in Buena Vista County, Iowa. (PSR ¶ 23; Ex. 46, 47, 48).

In early May 2017, an individual was caught on camera at a Humboldt, South Dakota DAPL valve site. (PSR ¶ 24; Ex. 49, 50). An on-site camera captured the individual wearing black outerwear, gloves, a dark baseball cap, and possibly a dark mask. (PSR ¶ 24; Ex. 50). The individual carried a yellow crate which appeared to contain equipment associated with a hand-torch. (PSR ¶ 24; Ex. 50). Items and clothing consistent with this description were later recovered from the residence where Montoya and Reznicek were living. (PSR ¶ 24; Ex. 55-63). Witnesses observed a female, wearing black clothing, a bandana, and a pink under shirt, carrying a milk crate containing what they believed to be an acetylene torch. (PSR ¶ 24; Ex. 55-63).

This individual later entered a car bearing Iowa plates before driving away. (PSR ¶ 24).

Finally, on May 2, 2017, authorities discovered that Montoya and Reznicek had attempted to cut a hole in the pipeline at a DAPL site located in Hedrick, Iowa. (PSR ¶ 25; Ex. 51, 52). The hole was made with a cutting torch and was similar to the vandalism acts occurring between March 13 and 17, 2017. (PSR ¶ 25; Ex. 51, 52).

The calculated tactics employed by Montoya and Reznicek to hinder and destroy construction of the DAPL are extremely hazardous and dangerous. By using accelerants to set fire to thousands of dollars worth of construction equipment and using an acetylene torch to burn holes into a pipeline which would soon transport natural gas, Montoya created an extremely dangerous situation. Her decisions and conduct failed to take anything other than her own opinions and desires into consideration. Certainly not the significant financial impact to the victim company and the consumers who would benefit from the DAPL. (Ex. 65, filed under seal).

Worse yet, subsequent to their attempts to sabotage the DAPL, Montoya and Reznicek sought to multiply the impact of their criminal behavior by embarking on a speaking tour designed to inspire and encourage other would-be terrorists. (Ex. 3, 5, 6, 7). On August 26, 2017, Montoya and Reznicek gave a presentation at the Iowa City Public Library entitled Why We Acted: Finding Common Ground. (Ex. 5). During this presentation, Montoya and Reznicek discussed their attempts to sabotage the DAPL and encouraged those present to do the same. (Ex. 5A, 5B, 5E, 5F, 5G).

Montoya and Reznicek bragged about not getting caught and railed against state repression. (Ex. 5C, 5D, 5F).

On September 29, 2017, Montoya spoke at a venue in Minneapolis entitled Dismantling DAPL: A Conversation with Jess Reznicek and Ruby Montoya. (Ex. 6-1, 6-2). During this presentation, Montoya and Reznicek encouraged the audience to "consider property destruction" as a means of stopping the pipeline (Ex. 6A), bragged about evading criminal charges (Ex. 6B, 6E), discussed tactics to avoid detection (Ex. 6C, 6D), and that burning the machinery was the right thing to do (Ex. 6E).

There is also evidence that Montoya and Reznicek successfully motivated others to engage in similar acts. (Ex. 4). In August of 2017, the Facebook page for Shut Down Fossil Fuels apparently blocked an oil train from public travel. As part of that post proclaiming this action, the group stated their "action is in solidarity with Ruby Montoya and Jessica Reznicek - who successfully taught themselves how to sabotage the Dakota Access pipeline (DAPL), delayed construction of DAPL for weeks, and never got caught until they turned themselves in recently. We admire their courage tremendously." (Ex. 4).

## CONCLUSION

The government's recommendation in this case is based primarily on the seriousness of the offense, including the danger, potential danger, and significant financial loss caused by the actions of Montoya and Reznicek. In addition, the need to afford adequate deterrence to criminal conduct, including criminal conduct

Reznicek and Montoya sought to inspire, is also significant given their actions and statements following their attempts to sabotage the DAPL.

The government originally recommended a 180 month' sentence for Reznicek. On June 30, 2021, the Court sentenced Reznicek to 96 months imprisonment. Therefore, to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, along with recognition of the severe impact of USSG §3A1.4(a) on Montoya's criminal history category, the government recommends a sentence of 96 months' imprisonment.

Respectfully Submitted,

Richard D. Westphal
United States Attorney

By: */s/ Jason T. Griess*
Jason T. Griess
Assistant United States Attorney
United States Courthouse Annex
110 East Court Avenue, Suite 286
Des Moines, Iowa 50309-2053
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: Jason.Griess2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2022, I electronically filed the foregoing with the Clerk of Court using the CM ECF system. I hereby certify that a copy of this document was served on the parties or attorneys of record and the United States Probation Officer by:

\_\_\_\_ U.S. Mail   \_\_\_\_ Fax   \_\_\_\_ Hand Delivery

 X  ECF/Electronic filing   \_\_ Other means (email)

UNITED STATES ATTORNEY

By:   */s/ Jason T. Griess*
     *Assistant U.S. Attorney*